Good morning, your honors. John Nadler, pro per. May I proceed? I would like to reserve two minutes. May it please the court. In this case, the district court erred by finding summary judgment in favor of the defendants. They did so primarily because they ignored the issue that there were genuine issues of material fact that precluded summary judgment in favor of the defendants. And under the plain language of rule 56, the burden is on the movement, in this case the defendants, to show that there is no genuine issue of material fact. Well, the district judge was Judge Breyer, correct? Yes, your honor. And in reading that judgment, there's a couple of things that I would like you to address. It would appear to me that, you know, first, you're required to establish a prima facie case on certain of the issues. Then the judge gave you the benefit of saying, okay, you've established the prima facie case. And then the defendants came back and said what they purported to be the legitimate reasons for the actions that they took. And where the judge found where you had problems is then it shifted back to you to show pretext for some of the actions that they took. And there were a couple of, you had a couple of theories. You claim that the facts in your case are controlled by the Miller case. And the judge felt that your case did not rise to the level of Miller and it was a mere paramour situation of favoritism as opposed to the Miller case where it was more pervasive and I think there were three affairs and, you know, and all of that. So the court distinguished that and said the paramour theory of favoritism was a problem to you. And then the one rule, the same person that hired you was the person that took the subsequent action. So the court did all of that. So tell me how, if you get to, you know, the court put you, said it sort of collapsed in the pretext stage, that you didn't put any evidence to rebut what they said. Well, I believe they actually, the district court was somewhat confused because I don't think you reached the issues of law if defendants fail to carry their burden on the genuine issue of material fact. And also on the pretext issue itself, when the district court reviewed the facts, there were several instances where there were disputes as to facts. Well, but not every dispute of facts defeats summary judgment. Obviously you said the key word, it has to be material. So what are the material ones that you're talking about? For example, on the desperate impact, in this case I was paid less than similarly situated attorneys. And the district court at one point said that the initial hiring at $55,000 was work for a paralegal. I submitted documents, deposition testimony and a declaration which showed that that was not true. And in fact, I did work as an attorney. I did the same work as other attorneys in the office. But you hadn't passed the California bar yet, right? Right. But I did work on cases that were not necessarily California cases. And I was barred in Louisiana. So I was able to do that. Isn't passing the bar of the State where you're working recognized by most law firms as a reason to give an increase in salary to a young associate? Well, in this case. I'm not talking about this case. I'm talking about in general. I mean, isn't that accepted as a young lawyer when you pass the bar of the State you're working in, you get an increase in salary? And did you not get that? I'm actually not sure what the policy is in other firms. And what happened, there was actually another attorney in the office who was paid substantially more, the paramour of Ben Firth, and she also was not licensed in the State of California. She actually was not licensed until well after I left the firm. So what's your best evidence of pretext? My best evidence of pretext is I was called a racial slur. I was treated differently in terms of the assignments I got and the work I did, even though I did work similar to other attorneys. I felt that sometimes I was giving the lesser work than I should have been. In addition, I was paid less than other attorneys. And I think as a whole, all that information together adds up to pretext, at least enough to go to a jury, because there are questions of fact that shouldn't be decided by a judge. I mean, the Ninth Circuit itself has said that in civil rights cases, very little evidence is needed to sustain or very little evidence is needed to defeat a summary judgment motion, because these cases are so fact-intensive. I submitted a declaration by a coworker which showed that she, in her opinion, thought I was treated differently from other people. And I think together that does create sufficient facts to support pretext enough to defeat summary judgment. I think we have your argument in hand. Do you want to save the rest of your time for rebuttal? You've got five minutes. You can use them now, but I think we have your argument in hand for the primary. So thank you. Good morning. May it please the Court. My name is Allison Cabrera, and I represent the respondents in this action, the Firth Firm and Ben Firth. This morning I am here to request respectfully that this Court affirm the decision of the United States District Court for the Northern District of California, the Honorable Judge Charles Breyer. What I would like to do is focus primarily on the summary judgment issue to address the issues just raised by the Court, and I am, of course, happy to answer any questions that the Court has about any issue in the record. Well, let me ask you this. Why does it – and this is one thing that the appellant raised – why does the fact that the Firth Firm retained Gordon and Reese to defend against Mr. Nadler's action while Nadler was working at the firm, why doesn't that give rise to an inference of retaliation? Your Honor, there's absolutely nothing in the record to establish – and actually, let me back up. I would like to give the Court a little bit of factual background. The basis of the plaintiff's contention is that a negative reference was provided to Gordon and Reese regarding Mr. Nadler. There's absolutely nothing in the record to establish that. And, in fact, the only evidence in the record squarely contradicts that fact. There is a declaration in the record from Frances Lopez. She was the head of the paralegal department at Gordon and Reese, and she submitted a declaration stating that she had no idea that there was even litigation going on at the time that they ended Mr. Nadler's services. Also, Gordon and Reese was not Mr. Nadler's employer. He was a temporary employee at Gordon and Reese, so his temporary employment had ended. It's – there's not really a lot to that issue. It's just pure speculation. There's no support for that in the record whatsoever. Well, on another area, when the district judge was evaluating the effect of the alleged statement of cheese whiz, the district court was also considering the same actor inference and said that that played into evaluating what the effect was. If a different partner in the Firth firm, you know, had taken action against Mr. Nadler, would the claim – would his claim of racial discrimination have to go to trial? Absolutely not, Your Honor. First of all, just to be totally clear on the facts, there is nothing in the record whatsoever to establish that anyone other than Ben Firth both hired, increased pay for Mr. Nadler, and then terminated Mr. Nadler five and a half months after that. So just to be totally clear. Right. And I know that. Okay. So you have the same actor inference. The same actor inference applies. And the court did consider that. Absolutely. And evaluated that against what he presented. But I'm trying to sort of get the – you know, what this comment that was made, even if it had not had the same actor inference, do you think he stated a cause for racial discrimination based on the one comment that he alleges? Absolutely not, Your Honor. And there are just so many reasons for that. To begin with, the term – How about the law? Okay. I like the law. Okay. Would you mind moving your microphone just a little closer to you? Yeah. Just pull it down like this. There you go. Is that better, Your Honor? That's much better. The term cheeses on its face carries no racial meaning. Also, it's important to consider that it's Ben Firth's intent that's at issue here. Ben Firth has testified and has provided a declaration – they're both in the record – that he actually did not know Mr. Nadler's national origin or race to begin with. That's not something subject to dispute. That's Ben Firth's state of mind. He did not know that Mr. Nadler was of Asian descent. Well, but let's say you use the N-word against someone, and then you claimed, well, I didn't know that they were African American. Would that matter? It might matter, Your Honor, because the N-word, as cases have recognized, traditionally does carry – it's often considered hate speech. It carries a traditional meaning. I mean, for example, a noose carries traditional meaning. I mean, there are certain iconic terms and iconic symbols that are associated with racism. Cheese whiz is not one of those terms. There is absolutely no analogous case – there's not a single analogous case in the record to show that cheese whiz rises to the level of a racial epithet. On the other hand, there are many cases in the record stating what things are racial epithets, and they are things such as the N-word. There's just no – there's nothing in the law that would dictate that cheese whiz is the equivalent of a racial epithet. No one understood it to be a racial epithet. There's just no support for that anywhere. Well, why did he say it? Why did – I think he said he didn't remember saying it, but I've never heard cheese whiz, so I don't – I mean, I know what cheese whiz is, I think. I've never eaten it. Your Honor, he does deny making the statement, but it doesn't matter because it's not a material dispute. And even beyond just the cheese whiz comment itself, Your Honor asked for, you know, legal precedent, a stray remark or even a one-time use of even something that is a racial epithet does not, as a matter of law, entitle someone to pursue their claim of summary judgment. In the same actor context, Your Honor, there's an additional hurdle for the plaintiff. I mean, you have to have extremely – you have to make an extremely high showing of circumstantial evidence to get over that. A one-time use of the word cheese whiz that Mr. Nadler acknowledges was not even made in his presence. It cannot overcome the same actor presumption. In cases where racial epithets have been allowed, there's always even been not only racial epithets, there's even been an aggravating circumstance. For example, berating the person in front of other people, terminating the person in front of other people. There's nothing like that here. This is, I was in another room and I overheard him, I think, call me cheese whiz, and so because of that, I get to take my claim to a jury. That just doesn't stand under any legal precedent. There's not a single case cited in the record that would support that as a matter of law. That claim should be dismissed. Well, it is undisputed that apparently there was a relationship between Firth and I think the name changes, whether it was Richards or – Kimberly Richards, Your Honor. Yes. You know, he argues that it's under Miller that that would allow him to go to a jury. Your Honor, that argument – Can you respond to that? Yes, Your Honor. I'm sorry to interrupt you. Your Honor, Miller is a case about widespread sexual favoritism. Just to be very clear on the facts of this case, there is not one fact showing favoritism of Ms. Richards. To be entirely clear, Ms. Richards had an extensive litigation background before she came to the Firth firm. She was started at a salary of $100,000 before she ever – the day she walked into the Firth firm, based on her excellent experience. Before Ms. Richards ever came to the Firth firm, she had actually already been admitted to California. had already been very active in a products liability case in California, so she was well-versed in substantive California law. She is not similarly situated to Mr. Nadler, and they are not comparable to each other. Even beyond that, there's nothing in the record to show that after the consensual relationship was entered, and to this day it remains a consensual relationship, that Ms. Richards was rewarded for that. From day one, she was put as the lead on the Walmart case. She was put at a $100,000 salary. There's no evidence that she was ever rewarded. What does the record show in terms of when the relationship began relative to Mr. Nadler's coming to the firm? The record does not show anything on that. Okay. But what the record does show is that her salary never changed. It was the same both before she entered a relationship with Ben Firth and after, and that she deserved that position based on her credentials and based on her experience, not based on her sex. There's no support for that in the record. Ms. Richards is a very competent attorney. She was very deserving of that job and very deserving of the pay she received. So there's just simply nothing in the record to support that. And the Miller case, Judge Barr was very clear. It's just distinguishable. Miller was widespread favoritism. People were talking in that office. You know, what do I have to do to get to the top? Sleep with someone? That type of dialogue was not going on at the Firth firm. There's nothing in the record to establish that there was any sort of hostile environment created by this consensual relationship. I think the record says that one time Ben Firth brought Kimberly Richards' flowers to work. I don't think that created a hostile work environment for anyone or Mr. Nadler. So on those grounds, we would ask that this Court affirm the decision of Judge Barr, unless the Court has any other questions. Thank you, Counsel. Thank you. Rebuttal. First, I would like to address some of the issues raised by the Court on the same actor role. As submitted in the record, Ben Firth, when asked at his deposition whether he hired Mr. Nadler, he said he couldn't recall. And he said Len Miller might have done it. And I think that's definitely evidence that is in dispute that could show that the same actor role is not applicable in this matter. Second, on the racist slur. Well, you know who hired you. You know who hired you. Who hired you? Well, I talked to both Ben Firth and Len Muir. Okay. And actually, in the record, Len Muir wrote the bio. And Ben also told me that his father, Fred Firth, I was actually under the impression that Fred Firth hired me. Because he said before I can do this, I have to talk to my father. And, again, different actor. And on the issue of the racial slur, the intent of who says it is not an element or an issue in the case. For example, in the D case, the supervisor called someone and said, you Filipino. I'm sure if you asked him, he didn't think that that was offensive. Yet, it was enough to survive summary judgment. And it was found that single instance was enough to create liability. Further, I think it's an issue of fact to the jury to determine the impact of the racial slur. And also, there are many slurs that come about after just a single use. Last year, a person running for senator used the word macaca. He did not think that that was a racial slur. Yet, the public interpreted it as one. And as a result, he lost support and eventually lost the race. And I submitted evidence that references to cheese are recognized as racial slurs against Asians. In the record, I include a reference to cheese nip, which refers to people that are part Asian and part white. And as to not being present, the record clearly shows I was there. How else could I have heard the comment? I was right behind Ben Firth when he said it. Therefore, I was the one that saw it. And it's not an issue of not seeing it. And I think defense counsel is wrong on that point, and it's clearly in the record. On the issue of favoritism, she said Kimberly Richards was paid the same amount before and after she dated Ben Firth. But she also conceded that she didn't know when the relationship started. Therefore, there can be no basis for that foundation. Well, what does the evidence show about what her starting salary was? There's a document in there produced by the Firth firm that showed it. And during the deposition, I tried to ask Ben about that. And as I recall, I don't think he was as familiar with it. Also, there's a bonus structure involved, and I could not obtain discovery, even though I tried, on the amount of bonuses that she received. And as to her being an excellent attorney, ever since she's left the Firth firm, I believe she's worked at a single firm, and then now she's listed as being in North Carolina and not employed. Ben Firth hasn't been employed since a few months after he left the Firth firm. He plays golf in New Mexico. As to her litigation experience versus my litigation experience, Ben Firth himself testified, and it's in the record, that he didn't know what my experience was. He didn't look at my resume. I had motion practice. I had prepared discovery. I had done lots of things involved in litigation, and there was no direct comparison. Also, under the Equal Pay Act, you look at the job. You don't look at the individual person. And if you look at the job that we performed, at the time we were hired, we did similar things. In fact, I worked on more cases than Kimberly Richards worked on. And there were, as shown in the record by people talking about what went on between Richards and Firth and whether you had to sleep to get to the top. She was referred to as the Queen Bee. People knew not to cross her. I inserted evidence where other people had crossed her and were fired because of her relationship with Ben. And then as to the negative reference at Gordon and Reese, I believe it should be in the record. I think in my declaration I stated that two days before I was let go, the other defense attorney from Gordon and Reese came and spoke to me and said, you know we're retained by the Firth firm, so I can't have you come into my office. And, you know, are you going to move to disqualify us? I can't remember if that was then or later. He asked if I was going to move to disqualify them based on the retaliation. And so there was definitely worry on the side of Gordon and Reese prior to the time I was let go. And as for the other issues, I think there are a few other issues that need to be addressed. The default to Ben Firth, the improper joinder, and the issues of costs. And I don't know if the Court has any of those. I think your briefs are adequate on those issues. Are there any other questions? Any questions? No. Thank you for your argument. Thank you. The case just heard will be submitted. We'll receive the last case on this morning's oral argument calendar, which is Musa Yelian v. Gonzalez. Thank you.
judges: Thomas, Callahan, Roth